UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

LINDA HENSON O/B/O CYNTHIA HENSON

                Plaintiff,

    -against-

CAROLYN W. COLVIN,
Commissioner of Social Security

-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**13-CV-5934 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Pro se Plaintiff Linda Henson, on behalf of Claimant Cynthia Henson,[1] brings this action

pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration's

(the "SSA") determination that Cynthia Henson was not disabled and therefore did not qualify

for Social Security Income benefits. Defendant Carolyn W. Colvin, the Commissioner of Social

Security (the "Commissioner"), has filed a motion, and Plaintiff has filed a cross motion,[2] for

judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (See Def.'s Not.

of Mot. (Dkt. 23); Pl.'s July 14, 2014, Ltr. ("Pl.'s July 14, 2014, Ltr.") (Dkt. 22).) For the

reasons stated below, the Commissioner's motion is DENIED, Plaintiff's motion is GRANTED,

and the case is REMANDED to the SSA for further proceedings.

## I.    BACKGROUND

###    A.    The Administrative Law Judge's Decision

Before the Administrative Law Judge ("ALJ") in 2012, Claimant asserted that she was

disabled because she suffered from hypertension, chronic obstructive pulmonary disease

---

[1] Cynthia Henson passed away on July 1, 2013. (See Compl. (Dkt. 1) at 4, 10.)

[2] While Plaintiff did not formally file a cross motion for judgment on the pleadings, she requested a remand in her July 14, 2014, letter, which the court construes as a cross motion. (See Pl.'s July 14, 2014, Ltr. at 1.)

("COPD"), genitourinary problems, and gastrointestinal symptoms. (See Administrative Rec
("R.") (Dkt. 9) at 20.) According to Claimant, these impairments prevented her from engaging
in substantial gainful activity from June 7, 2006, through her date last insured ("DLI") of
December 31, 2009. (Id.) The ALJ found that only Claimant's hypertension was significant
enough to be classified as a severe impairment, while her other impairments were acute and
transitory difficulties. (Id.) The ALJ further determined that the hypertension did not meet or
equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.
(Id.) The ALJ found that Claimant had the capacity to perform the full range of medium work as
defined in 20 C.F.R. § 404.1567(c), including lifting or carrying up to fifty pounds, frequently
carrying up to twenty-five pounds, and sitting, standing, and walking six hours out of an eight-
hour day. (Id. at 21.) Thus, the ALJ found that Claimant was not disabled.

B.     **Factual Background**

Claimant was born on December 28, 1959. (Id. at 57.) She graduated from high school
and attended one year of college. (Id. at 158.) Claimant was employed by the New York City
Department of Corrections from June 1982 through July 2002. (Id. at 174.) As a corrections
captain, Claimant was responsible for supervising, scheduling, managing, counseling, and
evaluating corrections officers. (Id. at 177.) She was also responsible for responding to violent
incidents that occurred in the correctional facilities. (Id. at 177, 182.) Claimant moved to North
Carolina sometime between 2002 and 2005. (Id. at 36, 209.) In 2005, Claimant worked as a
receptionist at a car dealership in North Carolina. (Id. at 174.) Her duties included answering
phones, completing dealership documents, and inputting data. (Id. at 176.) She last worked as a
cashier and license recorder at the Raleigh-Durham Airport Authority from September 2005
through May 2006. (Id. at 174.) This position involved walking three to five miles nightly to

2

record the license plate numbers of all of the vehicles parked in the airport parking garages, in addition to collecting toll fees from vehicles departing the parking garages. (Id. at 175.) Claimant stopped working for the Airport Authority on May 9, 2006, as a result of her health and the general work conditions. (Id. at 158.) Claimant's alleged disability onset date is June 7, 2006.[3] (Id. at 144.)

<blockquote>1.   Relevant Medical Evidence from After June 7, 2006, (the Alleged Onset Date) and Prior to December 31, 2009 (Claimant's DLI)</blockquote>

On February 15, 2008, Claimant first went to see Dr. Keith Merritt at Advanced Care for Women in Sanford, North Carolina, complaining of perirectal pain and irritation, as well as discharge from her right nipple. (Id. at 271.) Claimant reported that she smoked one pack of cigarettes per day, rarely drank, did not use drugs, and had no vision change. (Id.) The notes concerning Claimant's medical history reflect that she suffered from hypertension, for which she was taking Enalapril and HCTZ, and that she had undergone a supercervical abdominal hysterectomy. (Id.) Dr. Merritt took GC/chlamydia and trichomoniasis probes and ordered various blood tests. (Id.) He prescribed Diflucan, Valtrex, and Metrogel, and scheduled Claimant to return in three weeks for a complete physical. (Id.)

Claimant returned for her follow-up appointment on March 3, 2008. (Id.) Her test results came back positive for herpes simplex virus type II ("HSV II"). (Id.) As reflected in the medical report, Claimant stated that she believed that she contracted HSV II from her husband before

---

[3] In a Disability Report dated October 5, 2010, Plaintiff stated that her condition became severe enough to keep her from working as of August 12, 2006, but the record—including other documents submitted by Plaintiff—otherwise reflects an onset date of June 7, 2006. (See R. at 144, 154, 158, 214.) The court treats June 7, 2006, as the onset date since neither party alleges that there was a change in Plaintiff's condition between June 7, 2006, and August 12, 2006.

they separated.[4] (Id.) Claimant weighed 172 pounds, her blood pressure was 164/98, and she had a tender eight centimeter mass on the right adnexa of her uterus (uterine appendages). (Id. at 270-71.) Claimant told Dr. Merritt that she had experienced intermittent, severe pain in that area for some time. (Id. at 270). Per Claimant, surgical removal of the mass had previously been planned, but had been delayed due to a failure to receive the required surgical clearance from a cardiologist. (Id.) Claimant's physical exam results were otherwise normal. (Id.) Dr. Merritt prescribed Diltiazem for Claimant's hypertension. (Id.)

On March 19, 2008, Claimant presented for a pelvic ultrasound. (Id.) The ultrasound showed the right ovary measured 6.8 by 5.4 centimeters, containing a 5.7 by 5.0 centimeter simple cyst, and the left ovary with multiple cysts measuring 3.9 by 2.8 centimeters in aggregate. (Id.) Dr. Merritt and Claimant discussed removal of both ovaries, including the hormone replacement therapy ("HRT") that would be required post-surgery. (Id.)

On March 24, 2008, Claimant presented for a pre-surgery consultation for removal of her ovaries. (Id.) The medical report reflects that while Claimant was asymptomatic for cardiac ischemia, she had hypertension, for which she would need new blood pressure medication after the procedure. (Id.) Claimant weighed 171 pounds and her blood pressure was 178/94. (Id. at 269.)

On April 7, 2008, Claimant underwent removal of both of her ovaries and her fallopian tubes at WakeMed Cary Hospital ("WakeMed"). (Id. at 602-03.) During the surgery, Claimant's ureter was severed and had to be reimplanted. (Id. at 586, 602-03.) In the first twenty-four hours post-surgery, Claimant's respiratory status worsened. (Id. at 603.) A CT scan

---

[4] The remaining record and Plaintiff's testimony reflect that Plaintiff was not married but did have a long-term boyfriend. (See R. at 49, 129, 309; see also Compl. (Dkt. 1) at 4.) However, the court does not need to resolve this discrepancy because Plaintiff's marital status does not impact the payment of disability benefits.

ruled out pulmonary embolism but showed mucous plugging with severe atelectasis (collapsed

lung). (Id. at 603.) Claimant underwent a bronchoscopy on April 8, 2008, and again on April 9.

(Id. at 603, 604-07.) She was also treated with vigorous chest physiotherapy, Albuterol, and an

ipratropium nebulizer. (Id. at 603.) By April 11 she had a normal respiratory rate without

shortness of breath. (Id.) Claimant was discharged that day with a Foley catheter in place, a leg

bag, and the following medications: Ibuprofen, Percocet, Albuterol, Macrodantin, mineral oil,

Hydrochlorothiazide, Enalapril, and Chantix. (Id. at 604.) Claimant's discharge diagnoses

included COPD. (Id. at 602.)

On April 14, 2008, Claimant told Dr. Merritt that her condition was improving and that

she was becoming more mobile. (Id. at 269.) Dr. Merritt also spoke with Dr. Vora,[5] Claimant's

treating pulmonologist from WakeMed, who suggested that Dr. Merritt prescribe an Advair

discus and Levaquin. (Id.)

On April 19, 2008, Claimant went back to WakeMed after she noticed blood in her urine.

(Id. at 582.) Additionally, Claimant felt weak and dizzy, and experienced generalized abdominal

pain, bladder spasms, and shortness of breath. (Id. at 582-83.) The treating doctor noted that

Claimant's breath sounds were diminished but equal bilaterally, with no wheezing. (Id. at 586.)

A chest CT scan came back negative for pulmonary embolus (clot) but suggested thyroid

enlargement. (Id. at 599.) A CT scan of Claimant's abdomen and pelvis showed a slightly

thickened bladder, but no abscess or bowel obstruction. (Id. at 587.)

Claimant returned to Dr. Merritt for a check-up on April 21, 2008. (Id. at 269.) She

weighed 170 pounds and her blood pressure was 140/76. (Id.) Dr. Merritt reported that

Claimant's condition was much improved after her recent hospitalization. (Id.) He scheduled a

---

[5] Dr. Merritt's notes refer to Dr. Valdez instead of Dr. Vora. (See R. at 269.) The court uses Dr. Vora because the WakeMed medical records solely reference the treating pulmonologist as Dr. Vora. (See id. at 602-03.)

follow-up appointment with Claimant for three weeks later, after the removal of her Foley catheter and the stent. (Id.)

On April 28, 2008, Claimant presented to Dr. Merritt complaining of an onset of chills, myalgia, nausea, and vomiting. (Id.) She appeared ill and dehydrated. (Id.) Claimant was admitted to WakeMed later that day and treated for pyelonephritis (kidney infection), bleeding internal hemorrhoids, and a non-bleeding peptic ulcer. (Id. at 268, 572-73.) Claimant's lungs remained clear to testing during the hospitalization. (Id. at 572.) Doctors removed Claimant's Foley catheter and the stent during her hospital stay. (Id. at 268.) Claimant was discharged on May 2 with instructions to follow-up in two weeks and she was prescribed the following medications: Premarin, Diflucan, Augmentin, Enalapril, Hydrochlorothiazide, and Advair discus. (Id. at 572-73.)

Claimant returned to Dr. Merritt on May 5, 2008; he noted that she was doing well and was pain free, although suffering from diarrhea. (Id. at 268.) She weighed 171 pounds. (Id.) Dr. Merritt also expressed concern about Claimant's blood pressure of 184/92. (Id.) At this time, Claimant was no longer taking pain medications or smoking cigarettes and was treating her asthma with Advair. (Id.)

On June 2, 2008, Claimant saw Dr. Merritt. (Id.) While Claimant's weight had dropped to 149 pounds, she reported that she felt great and that her normal appetite had returned. (Id.) Claimant's blood pressure had decreased to 108/68. (Id.) Dr. Merritt prescribed Lactulose and instructed Claimant to increase her mineral oil intake. (Id.)

On March 9, 2009, Claimant returned to Dr. Merritt for her annual physical. (Id. at 267.) Per the medical report, Claimant had ceased taking her hormone replacement therapy and blood pressure medications and had been experiencing some lower pelvic discomfort in her right lower

quadrant ("RLQ") over the last month. (Id.) Her blood pressure was elevated at 197/114. (Id.) Dr. Merritt started Claimant on Diltiazem CD 180 mg for her blood pressure. (Id.)

Claimant returned on March 19, 2009, for an evaluation of her RLQ pain. (Id.) No pelvic masses were found. (Id.) Claimant's blood pressure was 150/111 and her weight was 148 pounds. (Id.) Dr. Merritt doubled Claimant's Diltiazem prescription. (Id.)

Claimant's blood pressure was 200/108 when she returned for a check-up on March 23, 2009. (Id. at 268.) Dr. Merritt instructed her to stop taking Diltiazem and started her on Labetalol 200 mg and HCTZ 25 mg to treat her hypertension. (Id.)

On April 6, 2009, Claimant's blood pressure was 160/102. (Id.) She reported that her Labetalol initially made her very sleepy but that the side effects had improved. (Id.) Claimant weighed 144 pounds and her blood pressure was 160/102. (Id.) Dr. Merritt increased the Labetalol to 400 mg. (Id.)

Claimant's blood pressure improved to 144/100 (and 138/94 on repeat) at her appointment on April 20, 2009. (Id.) Claimant stated that the Labetalol was making her sleepy, so Dr. Merritt did not increase the dose. (Id.)

On June 22, 2009, Claimant went to see Dr. Merritt, complaining that the Labetalol was causing hair loss. (Id. at 265.) Claimant's blood pressure was 118/72 and she weighed 134 pounds. (Id.) Dr. Merritt observed that Claimant's hair was breaking off and she was not actually losing her hair from the scalp. (Id.) He reduced her Labetalol dose. (Id.)

By July 13, 2009, Claimant's blood pressure was 150/98 and her weight was 135 pounds. (Id.) Her side effects had subsided. (Id.)

On October 19, 2009, Claimant's initial blood pressure was 180/120, and after five minutes of rest it decreased to 160/98. (Id.) Claimant's weight had decreased to 129 pounds. (Id.) Dr. Merritt increased the Labetalol to 500 mg. (Id.)

On November 16, 2009, Claimant's blood pressure was 182/100 and Claimant stated that she forgot to take several of her Labetalol doses when she was out of town. (Id. at 264.) Dr. Merritt increased Claimant's Labetalol dose to 600 mg. (Id.)

While Claimant's blood pressure had decreased to 128/78 on her November 30 check-up, she was experiencing scalp tingling, constipation, and hot flashes. (Id.) Due to these side effects, Dr. Merritt decided to wean her off the Labetalol and replace it with another medication. (Id.)

Claimant's last appointment with Dr. Merritt before the DLI was on December 14, 2009. (Id. at 263.) Claimant weighed 131 pounds and her blood pressure was 178/110. (Id.) Claimant no longer had scalp tingling, but she was still constipated. (Id.) At the time, Claimant was still taking HCTZ and a lower dose of Labetalol, as well as Lisinopril. (Id.) Dr. Merritt discontinued the HCTZ, increased the Lisinopril, and kept Claimant on the lower dose of Labetalol. (Id.)

    2.    <u>Relevant Medical Evidence from after December 31, 2009, (the Expiration of Claimant's DLI) until the Date that Claimant's SSI Application was Denied by the ALJ</u>

On January 11, 2010, Claimant's blood pressure had increased to 214/118. (Id.) Claimant had stopped taking the Labetalol because of worsening hair loss, but she continued with her other medications. (Id.) Dr. Merritt sent Claimant to WakeMed for further testing due to her high blood pressure. (Id. at 354.) Dr. Joshua C. Macomber, from the cardiology unit, recommended that Claimant start on Norvasc in place of the Labetalol. (Id. at 357.)

Claimant went to see Dr. Macomber at Cary Cardiology on January 13, 2010, emphasizing her shortness of breath with fairly minimal activity, although Claimant denied any chest pain, orthopnea (shortness of breath when lying flat), paroxysmal nocturnal dyspnea (attacks of shortness of breath and coughing at night), or edema (swelling). (Id. at 259.) Claimant reported that she smoked a half pack of cigarettes daily; Dr. Macomber encouraged her to stop smoking. (Id.)

On February 11, 2010, Dr. Macomber noted that Claimant's hypertension was reasonably well controlled (with a blood pressure of 140/72) and Claimant's echocardiogram and Cardiolite stress test were otherwise unremarkable. (Id.) Dr. Macomber also noted that Claimant was feeling much better after she stopped taking Labetalol. (Id.)

On March 22, 2010, Claimant presented to Dr. Merritt for her annual physical. (Id. at 263.) Her blood pressure was under control at 122/72 and she weighed 125 pounds. (Id.) Claimant was taking Nifedipine ER, Lisinopril, and HCTZ to control her blood pressure. (Id.)

On March 25, 2010, Claimant returned to Dr. Merritt, complaining of shortness of breath and extreme fatigue. (Id.) Her heart rate was 50 beats per minute ("bpm") and Dr. Merritt suggested that Claimant follow up with her cardiologist. (Id. at 262.)

Claimant was admitted to WakeMed on March 27, 2010, with a sudden onset of weakness, hypotension night sweats, and radiographic evidence of right-sided pneumonia. (Id. at 250.) Her blood pressure was 96/62 and her heart rate was 66 bpm. (Id.) Claimant's transthoracic echocardiogram came back normal and she was treated for community-acquired pneumonia. (Id. at 248.) During the hospitalization, Claimant complained of dizziness; accordingly, her blood pressure medications were decreased. (Id. at 243.)

When Claimant returned to Cary Cardiology to see Dr. Rama Garimella on April 9, 2010, she reported that she had noticed increased swelling.[6] (Id.) Claimant's blood pressure was running high at 158/88, so she wanted to go back on HCTZ. (Id.) Dr. Garimella agreed to start her on a low dose and warned Claimant that if she experienced fainting spells again, she would have to cease taking the medication. (Id.)

On July 8, 2010, Claimant returned to Dr. Garimella for a follow-up. (Id. at 242). She weighed 133 pounds and her blood pressure was under control at 130/70. (Id.) Claimant was advised to return for a follow-up in one year. (Id.)

Claimant returned to Dr. Merritt on September 21, 2010, complaining of breathing problems, headaches, and decreased vision. (Id. at 262.) Claimant weighed 138 pounds, her blood pressure was 142/72, and her eyes were red and painful. (Id.)

On September 23, Claimant went to the WakeMed emergency room and was treated by Dr. Gregory J. Cannon for COPD-emphysema, blurred vision, and a sinus infection. (Id. at 297.) A chest X-Ray revealed no acute air space disease. (Id. at 277.) Claimant's corrected vision in both eyes was 20/100. (Id. at 291.) Dr. Cannon prescribed Augmentin and Prednisone and recommended that Claimant continue with her breathing treatments as needed. (Id. at 297.)

Dr. Merritt referred Claimant to Cape Fear Eye Associates, and Claimant presented to Dr. Miles Whitaker on September 28, 2010. (Id. at 375.) Per the medical record, Claimant's blurry vision started around September 2009 and the onset was gradual. (Id.) In addition, Claimant's right eye was bloodshot after falling and hitting the back of her head approximately three weeks earlier. (Id.) Dr. Whitaker noted that Claimant's recurrent episodes of high blood

---

[6] The medical records do not disclose the location of the swelling.

pressure could have damaged the nerves in her eyes and caused the drop in Claimant's vision. (Id. at 377).

Additional testing revealed that Claimant had sluggish pupils and bilateral visual field constriction, as well as significant proptosis (protrusion of the eyeball) for her demographic category. (Id. at 384-85, 389, 392.) The cause of Claimant's potentially nonorganic vision loss was not clear. (Id. at 387, 413.)

On October 25, 2010, Claimant experienced bilateral chest tightness and dyspnea on exertion while walking to a pulmonary clinic appointment at University of North Carolina Hospital. (Id. at 402.) Claimant reported that she had experienced chest tightness over the past two months when walking fifteen to twenty feet. (Id.) Dr. Kamran Mahmood of the Pulmonary Division observed that Claimant's COPD was poorly controlled, she was in moderate distress, and her Albuterol inhaler was ineffective. (Id. at 411.) Claimant also complained of frequent urination and blurry vision. (Id.) Dr. Mahmood recommended that Claimant follow up with a cardiologist and a pulmonologist, increase her Advair dose, and begin using a Spiriva inhaler. (Id.)

On November 8, 2010, Claimant returned to Dr. Mahmood for a follow-up. (Id. at 440.) She underwent pulmonary function tests and blood tests. (Id. at 440.) Claimant weighed 139 pounds and her blood pressure was 152/87. (Id.) Dr. Mahmood noted that Claimant had quit smoking three months earlier after smoking about one to one-and-a-half packs of cigarettes a day for about twenty years. (Id. at 440.) A CT scan of Claimant's neck showed thyromegaly (enlargement of the thyroid gland) and a left thyroid nodule. (Id. at 436.) Claimant's thyroid functions and levels were normal. (Id.) The echocardiogram did not show any pulmonary hypertension or left ventricle dysfunction, but Claimant's shortness of breath and low $FEV_1$ were

concerning. (Id.) Claimant failed to show any significant response to the bronchodilators, but was moving in the right direction, per Dr. Mahmood's report. (Id.) He wanted to proceed with a CT scan of Claimant's chest along with a six-minute walk test on her next visit. (Id.)

Claimant returned to Dr. Mahmood for evaluation of her COPD on February 7, 2011. (Id. at 429.) She reported that her breathing had improved slightly since her last visit but that she had occasionally experienced chest tightness and sometimes woke up two or three times a night with shortness of breath and coughing. (Id.) The CT scan of Claimant's chest revealed mild centrilobular emphysema and a left thyroid lobe that was enlarged and heterogeneous. (Id. at 429-30, 433.) It also revealed a lesion along the anterior right hemidiaphragm, which Dr. Mahmood noted could have been related to pleural versus liver growth. (Id. at 429-30.) Claimant's six-minute walk test was moderately below the normal predicted range. (Id. at 431.) Dr. Mahmood instructed Claimant to continue with her inhalers. (Id. at 430.) He also recommended additional testing including a stress test, cardiac work-up, CT scan of the abdomen with IV contrast, pulmonary function test, and nighttime oximetry. (Id.)

On May 26, 2011, Claimant went to see Dr. Saul Maslavi at North Shore Pulmonary Associates in New York. (Id. at 443.) A physical examination revealed no acute distress, although Claimant's voice was quite hoarse. (Id. at 444.) A chest X-Ray revealed an abnormal contour of the right hemidiaphragm. (Id.) Dr. Maslavi recommended a CT contrast scan of the chest and abdomen, along with a decrease in the quantity of medications that Claimant was taking, specifically removing Symbicort from Claimant's medication regimen. (Id. at 444-45.)

That same day, Claimant saw Dr. David Podwall at Neurological Associates of Long Island in New York. (Id. at 456.) Claimant's blood pressure was 132/68. (Id. at 461.) Claimant reported that she had been experiencing paresthesias (tingling) and numbness in her left arm

since early 2010 and in her left leg since early 2011. (Id. at 456.) Claimant stated that she experienced transient right leg paralysis in March 2011, but otherwise her symptoms were only on her left side. (Id.) The neurologic examination was normal. (Id. at 461.)

Claimant underwent a number of tests over the next few weeks, including MRIs of her spine and brain, electrophysiological testing, and a Visual Evoked Response ("VER") test. (Id. at 450-79.) The electrophysiological tests did not indicate cervical radiculopathy (pinched nerves) or myopathy (disease of muscle tissue). (Id. at 460.) The MRI showed multiple lesions that may have been related to Claimant's past trauma or history of hypertension. (Id. at 461.) There was no convincing evidence of multiple sclerosis, and Dr. Podwall noted that Claimant's neck pain and arm numbness were likely secondary to a mild sensory radiculopathy (nerve injury). (Id. at 461.) Claimant's VER test results were within normal limits. (Id. at 465.)

On July 11, 2011, Dr. Afaque Akhtar completed a Treating Provider Statement of Patient Limitations form, which stated that he treated Claimant monthly for COPD, hypertension, depression, and spinal stenosis.[7] (Id. at 481.) Dr. Akhtar estimated that Claimant could walk less than one city block without rest or severe pain. (Id.) Claimant could sit for fifteen minutes at a time before needing to get up and she could stand for ten minutes at a time before needing to sit down. (Id.) Dr. Akhtar opined that Claimant could sit, stand, and walk for less than two hours total in an eight-hour working day. (Id.) He also stated that Claimant could never lift or carry objects in a competitive work situation, and that she could never twist, stoop, crouch, climb ladders, or climb stairs. (Id. at 482.) Additionally, Claimant needed to use a cane or other assistive device while standing or walking. (Id.)

---

[7] While the Treating Provider Statement of Patient Limitations form does not indicate when Dr. Akhtar began treating Plaintiff, the medical records reflect that Dr. Akhtar became Plaintiff's primary care physician in November 2010. (See R. at 506.)

3.    Evidence Submitted to the SSA's Appeals Council after the ALJ Rendered
      His Decision

After the ALJ's decision, Claimant submitted treatment notes from Forest Hills Hospital

dated January 8, 2000, to March 19, 2004, as additional evidence for the Appeals Council to

review and consider.  (Id. at 610-88.)  These medical notes include various treatments in 2001

for shortness of breath, acute asthma exacerbation, and chest tightness.  (Id. 610-18, 641-45.)

Claimant also submitted a duplicate of the Treatment Report from Dr. Akhtar, dated

July 11, 2001, along with a statement from Dr. Akhtar, dated April 16, 2013, indicating that in

his medical opinion, Claimant had those same limitations on December 31, 2009.  (Id. at 689-

91.)

4.    Evidence Offered to the District Court after the Appeals Council Denied
      Claimant's Appeal

Plaintiff Linda Henson[8] contends that on remand she will be able to secure the following

additional evidence: an official statement from Dr. Merritt regarding Claimant's medical

condition from 2008 to December 31, 2009, assessing Claimant's ability to work and perform

daily activities during that period; documentation from the World Trade Center Health Registry

regarding Claimant's diagnosis and treatments relating to her work as a First Responder at

the 9/11 World Trade Center disaster site; and notarized letters from Claimant's various non-

medical care providers.  (See Pl.'s Apr. 3, 2014, Ltr. ("Pl.'s Apr. 3, 2014, Ltr.") (Dkt 12) at 5.)

Plaintiff has not yet provided such evidence.

5.    Non-Medical Evidence

a.    Claimant's Testimony

Before her hearing, Claimant completed a function report on October 8, 2010.  (R.

---

[8] Linda Henson is the executrix of Cynthia Henson's estate.  (See Compl. (Dkt. 1) at 10.)

at 166-73.) Claimant reported that she shopped for groceries monthly, but neighbors and friends handled most of her shopping. (Id. at 169.) Claimant went outside once a week, but could not go out alone because of her blurred vision and breathing problems. (Id.) She stopped driving in August 2010 due to her bad vision. (Id.) Claimant had eyeglasses, but she no longer used them because they did not assist with her vision problems. (Id. at 172.) She was able to pay bills, count change, and manage a savings account and checkbook. (Id. at 169.) Claimant's conditions did not affect her hobbies of crocheting, talking on the phone, or watching game shows, but she was no longer able to bowl, play tennis, or go for walks. (Id. at 170.) She also had difficulty playing cards and web surfing. (Id.) While Claimant was able to prepare small salads or sandwiches, she did not have the ability to prepare full meals because she was easily winded and exhausted. (Id. at 168.) She could iron and fold clothing, but it was a full day's task. (Id. at 168.)

Claimant reported that she was easily exhausted, and often felt weak and dizzy when standing up, squatting, bending, or kneeling. (Id. at 171.) She easily lost her breath and experienced light-headedness when reaching, walking, talking, climbing stairs, and completing tasks. (Id.) Claimant testified that she was able to walk ten to fifteen feet before having to rest for two to three minutes in order to catch her breath. (Id.) She was able to follow written and verbal instructions, but indicated that she could not finish what she started and could only pay attention for one to two hours. (Id.) Claimant reported that she woke up three to five times nightly in order to go to the bathroom and that she averaged three to four hours of sleep per night. (Id. at 167.)

During the January 19, 2012, hearing before Administrative Law Judge Edward Seery (the "ALJ"), Claimant testified that she last worked at the Raleigh-Durham Airport Authority,

but stopped working because of her emphysema. (Id. at 37.) Previously, she worked for twenty years at a maximum security all-male correctional facility, retiring as a captain. (Id. at 52.) Claimant testified that she quit smoking in 2008 after her lungs collapsed. (Id. at 38.) Claimant also stated that she had been trying to sell her home for a year because she struggled with walking up the stairs in her house and could no longer do any yard work. (Id.) She testified to experiencing spinal stenosis that started in her neck and then radiated down to her arm and leg, leading to numbness. (Id. at 39.) Claimant took Oxycontin to help with her pain, but the medication caused her to feel disoriented and lethargic. (Id. at 40.) Claimant testified that she also experienced all of these symptoms from 2006 to 2009 and confirmed that during that period she could only stand for fifteen or twenty minutes at a time before needing to sit. (Id. at 40-41.) Additionally, she could only sit for thirty minutes at a time before experiencing numbness in her leg. (Id. at 42.) Claimant testified that she experienced vertigo in 2008 and 2009, but that it was undiagnosed because her New York-based health insurance made it difficult for her to obtain affordable health care in North Carolina. (Id. at 43-44.)

Claimant testified that her worst medical problems, in order of severity, during the timeframe of 2006 until December 31, 2009, were: (1) difficulty breathing, (2) numbness in her leg and arm, and (3) blurred vision. (Id. at 45-48.) Claimant's father lived with her and helped her around the house until he passed away in 2009. (Id. at 47-48.) After that point, various friends and family members checked in on her, and her aunt cared for her during the week. (Id. at 48.) Claimant testified that she occasionally drove to the local supermarket, which was a quarter of a mile in distance from her home. (Id. at 49.)

b.      Vocational Expert: Melissa Stewart

Melissa Stewart, a vocational expert, also testified at Claimant's hearing. (Id. at 51-52.)

Stewart summarized Claimant's past work as a corrections officer as medium work in exertional

nature with a skill level of four. (Id. at 52.) Stewart also summarized Claimant's work as an

office helper as light work with a skill level of two. (Id.) Finally, Stewart classified Claimant's

work as a parking lot attendant as light work with a skill level of two. (Id.) Stewart did not

provide her opinion as to whether Claimant could perform her past work, nor did the ALJ ask her

for an opinion. (Id. at 51-52.)

## II.    PROCEDURAL HISTORY

On September 20, 2010, Claimant filed an application for Social Security Disability

Benefits, claiming that she had been disabled since June 7, 2006. (Id. at 18.) The SSA denied

the application initially on December 6, 2010, and upon reconsideration on February 14, 2011.

(Id.) Claimant filed a written request for a hearing on February 21, 2011. (Id.) On

January 19, 2012, the ALJ held a hearing at which Claimant appeared and testified in Raleigh,

North Carolina. (Id.) On May 3, 2012, the ALJ issued a written decision concluding that

Claimant was not disabled within the meaning of the Social Security Act through the DLI of

December 31, 2009, and denying Claimant's application for Social Security Disability Benefits.

(Id. at 24-25.) Claimant requested that the SSA Appeals Council review the ALJ's unfavorable

decision, and the Appeals Council denied the request for review on June 3, 2013, upholding the

ALJ's decision. (Id. at 5.)

On October 17, 2013, Plaintiff Linda Henson filed a Notice Regarding Substitution of a

Party upon Death of Claimant as the court-appointed executor for Cynthia Henson's estate, also

requesting an extension for filing a civil action. (Id. at 3-4.) The Appeals Council granted a 60-

day extension. (See Compl. (Dkt. 1) at 11.) On October 28, 2013, Plaintiff filed the instant

action pro se, seeking judicial review of the SSA's decision pursuant to 42 U.S.C. § 405(g). (See

Compl. (Dkt. 1) ¶¶ 1-2.) The Commissioner filed her Answer on February 21, 2014. (See

Answer (Dkt. 10).) The Commissioner then filed a Motion for Judgment on the Pleadings

pursuant to Federal Rule of Civil Procedure 12(c), with Plaintiff filing a cross-motion. (See

Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings (Dkt. 24); Pl.'s July 14, 2014, Ltr.)

## III.  LEGAL STANDARD

### A.  Review of Final Determinations of the Social Security Administration

Under Rule 12(c), "a movant is entitled to judgment on the pleadings only if the movant

establishes 'that no material issue of fact remains to be resolved and that [she] is entitled to

judgment as a matter of law.'" Guzman v. Astrue, No. 09-CV-3928, 2011 WL 666194, at *6

(S.D.N.Y. Feb. 4, 2011) (quoting Juster Assocs. v. City of Rutland, 901 F.2d 266, 269

(2d Cir. 1990)). "The role of a district court in reviewing the Commissioner's final decision is

limited." Pogozelski v. Barnhart, No. 03-CV-2914 (JG), 2004 WL 1146059, at *9 (E.D.N.Y.

May 19, 2004). "[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in

the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). "A district court

may set aside the Commissioner's determination that a claimant is not disabled only if the factual

findings are not supported by 'substantial evidence' or if the decision is based on legal error."

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "Substantial

evidence means more than a mere scintilla. It means such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." Moran v. Astrue, 569 F.3d 108, 112

(2d Cir. 2009) (internal quotation marks omitted). Thus, as long as (1) the ALJ has applied the

correct legal standard, and (2) the ALJ's findings are supported by evidence that a reasonable

18

mind would accept as adequate, the ALJ's decision is binding on this court. <u>See</u>

<u>Pogozelski</u>, 2004 WL 1146059, at *9.

**B.     Determination of Disability**

"To receive federal disability benefits, an applicant must be 'disabled' within the

meaning of the Social Security Act." <u>Shaw</u>, 221 F.3d at 131; <u>see also</u> 42 U.S.C. § 423. A

claimant is "disabled" within the meaning of the Social Security Act if she has an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The impairment must be of "such severity that [the claimant] is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy." <u>Id.</u> § 423(d)(2)(A).

The SSA has promulgated a five-step procedure for determining whether a claimant is

"disabled" under the Social Security Act. <u>See</u> 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). In

<u>Dixon v. Shalala</u>, the Second Circuit described this five-step analysis as follows:

> The first step in the sequential process is a decision whether the
> claimant is engaged in "substantial gainful activity." If so, benefits
> are denied.
>
> If not, the second step is a decision whether the claimant's medical
> condition or impairment is "severe." If not, benefits are denied.
>
> If the impairment is "severe," the third step is a decision whether the
> claimant's impairments meet or equal the "Listing of Impairments"
> set forth in . . . the social security regulations. These are
> impairments acknowledged by the [SSA] to be of sufficient severity
> to preclude gainful employment. If a claimant's condition meets or
> equals the "listed" impairments, he or she is conclusively presumed
> to be disabled and entitled to benefits.
>
> If the claimant's impairments do not satisfy the "Listing of

Impairments," the fourth step is assessment of the individual's residual functional capacity," i.e., his capacity to engage in basic work activities, and a decision whether the claimant's residual functional capacity permits him to engage in his prior work. If the residual functional capacity is consistent with prior employment, benefits are denied.

If not, the fifth and final step is a decision whether a claimant, in light of his residual functional capacity, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." If not, benefits are awarded.

54 F.3d 1019, 1022 (2d Cir. 1995) (internal citations omitted).

The "burden is on the claimant to prove that he is disabled." Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998) (internal citation and quotation marks omitted). But if the claimant shows at step four that his impairment renders him unable to perform his past work, there is a limited shift in the burden of proof at step five that requires the Commissioner to "show there is other gainful work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

In making the determinations required by the Social Security Act and the regulations promulgated thereunder, "the Commissioner must consider (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." Pogozelski, 2004 WL 1146059, at *10 (citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)). Moreover, "the ALJ conducting the administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits." Id.

## C. Treating Physician Rule

Under the SSA's regulations, "a treating physician's report is generally given more weight than other reports." Snell v. Apfel, 177 F.3d 128, 133 (2d. Cir. 1999). A "treating physician" is a physician "who has provided the [claimant] with medical treatment or evaluation, and who has or who had an ongoing treatment and physician-patient relationship with the individual." Sokol v. Astrue, No. 04-CV-6631 (KMK) (LMS), 2008 WL 4899545, at *12 (S.D.N.Y. Nov. 12, 2008). The SSA's "treating physician rule" requires an ALJ to give a treating physician's opinion "controlling weight" if "the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c). On the other hand, "[w]hen other substantial evidence in the record"—such as other medical opinions—"conflicts with the treating physician's opinion, that opinion will not be deemed controlling." Snell, 177 F.3d at 133. In addition, "some kinds of findings—including the ultimate finding of whether a claimant is disabled and cannot work—are reserved to the Commissioner" and therefore are never given controlling weight. Id. (internal quotation marks omitted.)

Even where an ALJ does not give controlling weight to a treating physician's opinion, the ALJ must assess several factors to determine how much weight to give the opinion. See 20 C.F.R. § 404.1527(c)(2). Specifically, the ALJ must assess "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schall v. Apfel, 134 F.3d 496, 503

(2d Cir. 1998); see also 20 C.F.R. § 404.1527(c)(2)-(6). While an ALJ need not mechanically recite each of these factors, he or she must "appl[y] the substance of the treating physician rule." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). The court will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion" or when the court "encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Id. at 33.

## IV. DISCUSSION

The ALJ found that Claimant last met the insured status requirements under the Act on December 31, 2009, (R. at 18), and then made the following findings with regard to the five-step process set forth above: (1) Claimant did not engage in substantial gainful activity from June 7, 2006, her alleged onset date, through her DLI of December 31, 2009 (id.);[9] (2) Claimant's hypertension was a "severe" impairment within the meaning of the Act, but her COPD, genitourinary problems, and gastrointestinal symptoms were acute and transitory difficulties and did not represent significant impairments (id.); (3) Claimant's impairments do not meet or equal the criteria necessary for finding a disabling impairment under the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, with special consideration given to Listing 4.03 (hypertension) with reference to Sections 4.02 (chronic heart failure) and 4.04 (ischemic heart disease) (R. 20-21); (4) Claimant was able to perform her past relevant work through the DLI, with the residual functional capacity to perform the full range of medium work

---

[9] The ALJ inferred that Plaintiff may have earned $7,200.35 in 2006, after the alleged disability onset date, but determined that the "work activity did not rise to the level of substantial gainful activity." (See R. at 20.) Plaintiff contends that the income was earned prior to June 7, 2006, and the record corroborates that assertion. (See id. at 134, 222.) Since the ALJ's mistaken belief did not affect his final determination of unemployment, the court finds the error to be harmless.

as defined in 20 CFR § 404.1567(c) because she could occasionally lift or carry up to fifty pounds, frequently carry up to twenty-five pounds, and sit, stand, and walk six hours out of an eight-hour day. (R. at 21.) Since the ALJ determined that Claimant was able to perform her past relevant work, there was no need for him to proceed to the final, fifth step. See 20 C.F.R. §§ 404.1560(b)(3), 416.920(a)(4).

Plaintiff argues that the ALJ erred in concluding that she was not disabled under the Social Security Act. (See Pl.'s Apr. 3, 2014, Ltr. at 1-2.) She contends that the ALJ incorrectly classified the impairments—specifically the COPD—as non-severe and failed to properly weigh the combination of Claimant's testimony and Dr. Akhtar's Treating Provider Statement of Limitations, while also failing to obtain the opinion of Dr. Merritt in making the final determination. (Id. at 3-6.)[10]

## A. The Treating Physician Rule

While the treating physician rule "does not technically apply when the physician was not the treating physician at all during the relevant time period," that "does not mean that the opinion should not be given some, or even significant weight." Rogers v. Astrue, 895 F. Supp. 2d 541, 549 (S.D.N.Y. 2012) (internal quotation marks omitted) (quoting Monette v. Astrue, 269 Fed. App'x. 109, 112 (2d Cir. 2008) (summary order)); see also Campbell v. Astrue, 596 F. Supp. 2d 446, 452 (D. Conn. 2009) (noting that a "retrospective medical diagnosis

---

[10] Additionally, Plaintiff alleges that the ALJ "acted unprofessionally and abused his authority" by making "lewd, offensive, and sexually discriminatory comments" at the January 19, 2012, hearing in reference to Plaintiff's prior work as a Corrections Captain. (See Pl.'s Apr. 3, 2014, Ltr. at 2; see also R. at 50.) This court finds that any comments made by the ALJ do not rise to the level of prejudice.

Plaintiff also contends that the attorney representing her in the matter was incompetent and provided "substandard representation." (Id. at 6.) The court finds that this claim does not meet the level of a constitutional violation to justify a remand on the grounds of ineffective counsel. Moreover, "the Supreme Court has never recognized a constitutional right to counsel in Social Security proceedings." Cornett v. Astrue, 261 Fed. App'x. 644, 651 (5th Cir. 2008) (citing Brandyburg v. Sullivan, 959 F.2d 555, 562 (5th Cir. 1992)).

by a subsequent treating physician is entitled to controlling weight when no medical opinion in evidence contradicts a doctor's retrospective diagnosis finding a disability" (internal quotation marks omitted) (quoting Rivera v. Sullivan, 923 F.2d 964, 968 (2d Cir. 1991)). Thus, while a retrospective opinion from Dr. Akhtar may "not be entitled to controlling weight, it would be entitled to significant weight." Rogers, 895 F. Supp. 2d at 550. However, the ALJ failed to give Dr. Akhtar's opinion any weight at all. The ALJ erred in failing to assess—or even acknowledge—the Treating Provider Statement of Patient Limitations completed by Dr. Akhtar. (See R. at 481-82; see also supra Part I.B.2.)

Dr. Merritt—Claimant's primary physician during the period in question—did not submit a treating physician's report, and the only available treating physician opinion was the one submitted by Dr. Akhtar. (See infra Part IV.B (discussing Dr. Merritt's missing report).) The ALJ did not seek the opinion of a state agency medical consultant, nor did he ask the vocational expert to provide her opinion as to "whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work . . . ." 20 C.F.R. § 404.1560(b)(2). While the ALJ did consider Claimant's testimony, he then determined that her statements were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 24.) Thus, the ALJ relied exclusively upon the available medical records in making his determination, without affording any weight to the offered medical opinion. (Id. at 22-24.) The Appeals Council determined that the report "did not include any indication of the period to which the statement applied and the record did not include treatment records that established that Dr. Akhtar had treated [Claimant] prior to the expiration of [her] insured status." (See id. at 6.)

However, "[a]n ALJ cannot reject a treating physician's diagnosis without first

attempting to fill any clear gaps in the administrative record" and "[i]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (quoting Harnett v. Apfel, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998)). Although Dr. Aktar's treating provider opinion may have been conclusory and was missing pertinent information, such as the length of the treatment relationship and the dates covered by the opinion, rather than contacting Dr. Aktar for clarification, the ALJ simply ignored the opinion. Instead, the ALJ should have asked Dr. Akhtar to provide "a sufficient explanation for any seeming lack of support for his ultimate diagnosis of complete disability." Rosa, 168 F.3d at 80. Upon remand, the ALJ should allow Dr. Akhtar the opportunity to provide this explanation.

### B.  Development of the Record

While "[t]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act," since "a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2009) (citing Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999)). The ALJ has this obligation "[e]ven when a claimant is represented by counsel." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009). In making his or her determination, the ALJ "shall consider all evidence available in such individual's case record, and shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability." 42 U.S.C. § 423(d)(5)(B).

The Social Security Act further provides that the ALJ "shall make every reasonable effort

to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make [a disability determination], prior to evaluating medical evidence obtained from any other source on a consultative basis." Id. The treating physician's opinion "is an especially important part of the record to be developed by the ALJ." Hilsdorf v. Comm'r of Social Sec., 724 F. Supp. 2d 330, 343 (E.D.N.Y. 2010); see also Devora v. Barnhart, 205 F. Supp. 2d 164, 172-73 (S.D.N.Y. 2002) ("The duty of the ALJ to develop the record is particularly important when it comes to obtaining information from a claimant's treating physician."). As the Second Circuit has recognized, "a treating physician's 'failure to include this type of support for the findings in his report does not mean that such support does not exist; he might not have provided the information in the report because he did not know that the ALJ would consider it critical to the disposition of the case.'" Rosa, 168 F.3d at 80 (quoting Clark v. Comm'r of Social Sec., 143 F.3d 115, 118 (2d Cir. 1998)).

This is precisely what Claimant claims with regards to Dr. Merritt's opinion. According to the available records, Dr. Merritt acted as Claimant's primary care physician from February 2008 through September 2010, covering a significant portion of the disability period. (See R. at 261-72.) In Claimant's May 20, 2012, letter to her legal counsel in response to the ALJ's Notice of Decision, Claimant wrote that Dr. Merritt told her "he felt that [Claimant's] chronic condition would prevent [her] from maintaining employment" and that he was unaware that any documents had already been received by his office and returned to the Social Security Administration. (R. at 227.) It is not clear why Claimant's counsel resubmitted Dr. Akhtar's opinion—which included new supplementary statements relating specifically to Claimant's condition at the time of the DLI—to the Appeals Council, rather than obtain and submit a report

from Dr. Merritt, although it appears Claimant's counsel believed that Dr. Akhtar had been Claimant's treating provider since 2008. (See R. at 221, 689-91.)

However, even if Claimant's counsel erred by submitting the wrong treating physician opinion to the Appeals Council, this does not excuse the ALJ for failing to develop Claimant's complete medical history by following up with Dr. Merritt for his treating physician opinion. Plaintiff asserts that she will be able to secure a treating physician opinion from Dr. Merritt pertaining to Claimant's ability to work and perform daily activities from 2008 through December 31, 2009. (See Pl.'s Apr. 3, 2014, Ltr. at 5.) Upon remand the ALJ should consider Dr. Merritt's opinion according to the standard set for by the treating physician rule. (See supra Part IV.C.)

### C.     ALJ's Medical Inferences

The ALJ proceeded with his own interpretation of Claimant's medical records after both failing to clarify Dr. Akhtar's opinion and failing to contact Dr. Merritt for his treating physician opinion. The Second Circuit has held that "[w]hile an ALJ is free . . . to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him." Camille v. Colvin, ---F. App'x---, No. 15-2087, 2016 WL 3391243, at *2 (2d Cir. June 15, 2016) (summary order) (citing Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998); McBrayer v. Sec'y of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)). Furthermore, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." Rosa, 168 F.3d at 79 (citing McBrayer, 712 F.2d at 799). This is precisely what the ALJ did when, instead of acknowledging the opinion provided by Dr. Akthar,  he determined that Claimant's COPD and genitourinary problems were "acute and transitory difficulties during the time frame in controversy, and did

not represent significant impairments." (R. at 20.) Moreover, after determining that the COPD was not of sufficient medical severity, instead of considering "the combined impact" of Claimant's COPD with her hypertension—as required by the SSA regulations—the ALJ focused his attention solely on Claimant's hypertension. 42 U.S.C. § 423(d)(2)(B). (See also R. at 20, 22-24.)

The Second Circuit has required that "a circumstantial critique by a non-physician, however thorough or responsible, must be overwhelmingly compelling to justify a denial of benefits." Bailey v. Comm'r of Social Sec., No. 13-CV-2858 (NGG), 2016 WL 3962950, at *10 (E.D.N.Y. July 20, 2016) (internal quotation marks omitted) (quoting Mendolia v. Astrue, No. 10-CV-0417 (ENV), 2013 WL 3356960, at *6 (E.D.N.Y. July 3, 2013)); see also Bahama v. Chater, 142 F.3d 75, 80-81 (2d Cir. 1998) (holding that the ALJ had erred in relying on his own analysis of the claimant's medical issues, "improperly set[ting] his own expertise against that of physicians who submitted opinions to him"). Moreover, the Second Circuit has "cautioned that an ALJ should set forth a sufficient rationale in support of his decision to find or not find a listed impairment"; however, "the absence of an express rationale for an ALJ's conclusions does not prevent [the court] from upholding them so long as [the court is] able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." Salmini v. Comm'r of Soc. Sec., 371 Fed. App'x 109, 112 (2d Cir. 2010) (summary order) (internal quotation marks omitted) (quoting Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)).

Here, the ALJ may have been justified in denying Claimant benefits based on her claim of leg and arm numbness and her claim of blurred vision, as the medical records indicate that Claimant first suffered from these ailments after the DLI of December 31, 2009. (See R.

at 375, 456). It is also possible—and not for this court to determine—that Claimant's COPD did not meet Listing 3.02(A) (chronic obstructive pulmonary disease) of the Listing of Impairments because her $FEV_1$ was not equal to or less than the values specified by the regulation.

However, the ALJ failed to address Claimant's $FEV_1$ or provide a sufficient rationale for his decision as required by 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02. The medical evidence pertaining to the dates in question frequently refer to Claimant's COPD symptoms and history, particularly during Claimant's April 2008 postoperative hospital stay. (See R. at 268-69, 572, 574, 582, 585-86, 595-607.) Thus, the ALJ should have provided a more in-depth explanation as to why he altogether disregarded Claimant's COPD claim in determining her disability status.

**CONCLUSION**

For the reasons set forth above, the Commissioner's motion for Judgment on the Pleadings is DENIED, Plaintiff's cross-motion for Judgment on the Pleadings is GRANTED, and this case is REMANDED to the SSA for a proper evaluation of the medical opinions and a reevaluation of Claimant's condition in light of all the medical evidence.[11]

SO ORDERED.

S/ Nicholas G. Garaufis

Dated: Brooklyn, New York
        August 2, 2016

NICHOLAS G. GARAUFIS
United States District Judge

---

[11] The ALJ may also consider Plaintiff's additional evidence in accordance with 42 U.S.C. § 405(g), which allows the court to "order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."